**UNITED STATES of America, Appellee,**

v.

**Antoine MOWAD, Appellant.**

**No. 460, Docket 80–1197.**

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1980.

Decided Feb. 17, 1981.

Rehearing and Rehearing In Banc Denied April 27, 1981.

---

Harold James Pickerstein, Chief Asst. U. S. Atty., Richard Blumenthal, U. S. Atty., D. Connecticut, Thomas S. Luby, Asst. U. S. Atty., Bridgeport, Conn., Daiga Osis, Law Student Intern, on brief, for appellee.

Douglas Gilmore, Westport, Conn., Raymond W. Ganim, Stratford, Conn., for appellant.

Before WATERMAN, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

WATERMAN, Circuit Judge:

Defendant Antoine Mowad appeals from a judgment of conviction entered on May 12, 1980 in the United States District Court for the District of Connecticut (Ellen Burns, Judge) after a jury trial resulting in ver-

dicts of guilty on April 7, 1980. Mowad was convicted of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1), of attempting to export firearms without an export license, in violation of 22 U.S.C. § 2778(c) and 22 C.F.R. §§ 123.01 and 127.-03, and of conspiracy to commit the two foregoing offenses in violation of 18 U.S.C. § 371. Mowad was sentenced to two years imprisonment on each of Counts One ("illegal dealing") and Two ("attempted illegal export"), the sentences to run concurrently, and to a five year term of probation on Count Three ("conspiracy"), to run consecutively to the sentences imposed on Counts One and Two.

On this appeal, Mowad raises a variety of challenges to the propriety of his conviction. First, he contends that the evidence adduced at trial was insufficient to provide support for the jury's verdict of guilty on each of the three charged violations of law. He also challenges the legal sufficiency of Count One of the indictment, and Count Three as well, for he maintains that he was a lawfully registered exporter of firearms at the time of his alleged violation of 18 U.S.C. § 922(a)(1) and therefore the trial court committed clear error by construing that statute so that he could be considered to be an unlicensed "dealer" in firearms.

For the reasons set forth below, we find no material error in the district court's rulings and the jury's verdict with reference to the attempted illegal export and conspiracy charges, and accordingly we affirm Mowad's conviction of these offenses. However, we conclude that the charge, Count 1, for dealing in firearms without having a license to do so should not have been submitted to the jury, and so we reverse Mowad's conviction for this offense and remand the case to the district court with directions to dismiss the illegal dealing charge and to vacate the sentence imposed therefor.

This case was commenced as a result of an investigation conducted by agents of the Bureau of Alcohol, Tobacco and Firearms (AT&F). In early November, 1978, AT&F agents began an investigation upon receiving information from a confidential source that certain individuals from Waterbury, Connecticut (later determined to be defendant Mowad and several companions) were attempting to purchase from the Sportsman's Rendezvous, a licensed federal firearms dealer located in Milford, Connecticut, a large quantity of firearms which they wished to export to Lebanon. AT&F agents thereupon made contact with one Vince Ciulla, an employee of the Sportsman's Rendezvous, who confirmed the information the agents had received. Ciulla and a friend, Robert Berger, the owner of the Yankee Gun Shop, a nearby licensed federal firearms dealer, agreed to cooperate with the AT&F agents in the investigation.

With Ciulla's consent, AT&F agents set up electronic monitoring and recording equipment in the Sportsman's Rendezvous. During the period between November 3, 1978 and April 6, 1979, Mowad and various of his companions made numerous visits to the Sportsman's Rendezvous and engaged in conversations with Ciulla, most of which were electronically recorded. During the course of these recorded conversations, a number of topics were discussed, including Mowad's desire to arrange a regular source of supply for periodic purchases of large quantities of firearms, "shop talk" concerning the prices and performance characteristics of various types of firearms, and preliminary negotiations arranged by Ciulla between Mowad and an undercover AT&F agent, posing as a private pilot, relating to the latter's proposal to smuggle a shipment of firearms, to be purchased by Mowad, out of the country.

Throughout the relevant period, Mowad repeatedly indicated to Ciulla his interest in acquiring large quantities of firearms for shipment to Lebanon, but the proposed deals frequently fell through, ostensibly because Mowad and his companions had been advised at various times by their contacts in Lebanon that passing a large shipment of firearms undetected through Lebanon cus-

toms would be too difficult.[1] Finally, however, Mowad and his companions apparently received word from their contacts in Lebanon that the difficulties with Lebanese customs had been removed, and, being advised by Berger of the continued availability of a supply of stolen firearms, they, following a series of late March 1979 visits to the Sportsman's Rendezvous, gave Ciulla a down payment of $3,000 and placed a definite order for an assortment of 110 handguns.

On April 6, 1979, Mowad and his companions arrived at the Yankee Gun Shop, where they met Ciulla and Berger. From there, the entire group proceeded to an abandoned warehouse building in New Haven, where the firearms were being stored. Mowad and his companions packed the weapons into two large wooden crates, which they had brought along for this purpose, using empty handgun boxes as filling material to balance out the load. After the weapons were crated, Berger was given $13,750 in cash, the remainder of the purchase price. Mowad and his companions then were arrested as they were removing the crates from the warehouse.[2]

Mowad was, as we have stated earlier, a lawfully registered exporter of firearms, and, at trial, his principal defense revolved around the contention that he, as such, had not engaged in any unlawful activity up to the time of his arrest. Mowad contended that he and his companions, had they not been arrested, would have transported the crated handguns to Mowad's home in Waterbury, Connecticut, and stored them there until Mowad could procure the necessary export license to ship the weapons legally to Lebanon.

On this appeal, Mowad, in attacking the validity of his conviction, continues to rely primarily upon his status as a lawfully registered exporter of firearms. With reference to the illegal dealing charge, Mowad maintains, as he did in the trial court below, that, absent a showing of some conduct inconsistent with a professed intent to export firearms, one who has lawfully registered as an exporter of firearms with the State Department under the Arms Export Control Act, 22 U.S.C. §§ 2751–2794, cannot as a matter of law be found to be a "dealer" under the Gun Control Act, 18 U.S.C. §§ 921–928.

In response, the Government does not contest Mowad's status as a legally registered exporter of firearms and does not challenge Mowad's assertion that the shipment of firearms in question was destined for export to Lebanon, and not for domestic sale. Rather, the Government maintains that the relevant statutory language [3] is literally applicable to Mowad's conduct. The Government reasons that Mowad, who is not a "licensed dealer" under the Gun Control Act, by his own admission intended to export firearms in his possession to Lebanon, conduct which logically is encompassed by the language "to engage in the business of . . . dealing in firearms . . . or in the course of such business to ship . . . any firearm . . . in interstate or foreign commerce," and thus is guilty of the charged statutory violation.

We agree with the Government's observation that "the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety*

---

1. During the months of February and March, 1979, Mowad and one of his companions, Sayid Kortobani, did purchase a total of 14 handguns from the Sportsman's Rendezvous, explaining to Ciulla that these guns were to be given as "gifts" to various officials in Lebanon to help ease the way through Lebanese customs for future shipments of firearms.

2. After being advised of his rights, Mowad was questioned as to his role in the firearms transaction. At that time Mowad disavowed any knowledge of what his companions were up to,

and stated that he was unaware that guns were involved until he arrived at the warehouse.

3. 18 U.S.C. § 922(a)(1) provides:
   (a) It shall be unlawful—
   (1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce.

*Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). However, we do not share the Government's belief that the clear meaning of the statutory language here unequivocally encompasses Mowad's conduct. Our doubts are raised initially by the fact that although the terms "importer" and "importing" are specifically mentioned in the statute, the terms "exporter" and "exporting" are conspicuously absent. Accordingly, because the express language of the statute does not clearly delineate the intended scope of its coverage, we shall turn to an examination of the legislative history of the statute, and to other related materials, for aid in ascertaining the intended sweep of this statutory prohibition.

Such an examination produces strong support for Mowad's position on this appeal. To begin with, the Gun Control Act was part of a comprehensive congressional legislative effort aimed at dealing with the rising tide of violent crime *within* the United States.[4] This congressional intent is clearly revealed by the preamble to the Gun Control Act:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title . . . [to] provide for the imposition by Federal regulations of any proce-

dures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title. [1968] U.S.Code Cong. & Ad.News 1397.[5] This declaration of congressional purpose was further amplified and detailed in the legislative history relating to the enactment of the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act.[6] Once again, it is worthy of note that although the problems posed by *imported* firearms were recognized and discussed,[7] no mention is made of *exported* firearms. This omission is consistent with Mowad's argument that the exportation of firearms from the United States was not one of the congressional concerns which prompted the enactment of the applicable legislation.

Moreover, additional support for Mowad's position is found in the fact that although members of Congress pointed to a potential conflict between the import licensing system then being administered by the State Department[8] and the import restrictions proposed in the Omnibus Crime Control and Safe Streets Act and the Gun Control Act,[9] no such concern over potential statutory overlap was voiced in the context of the parallel export licensing system also administered by the State Department. Indeed, the statutory overlap in federal regulation of imported firearms was removed by President Johnson two days after passage of the

4. In mid-1968, Congress considered and enacted Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, otherwise known as the State Firearms Control Assistance Act. Several weeks after passage of this Act, with the purpose of strengthening the firearms provisions contained in the just-enacted legislation, Congress passed the Gun Control Act of 1968. *See* H.R.Rep.No.1577, 90th Cong., 2d Sess., [1968] U.S.Code Cong. & Ad.News 4410, 4412.

5. *See also Findings and Declaration*, Title IV, Omnibus Crime Control and Safe Streets Act, [1968] U.S.Code Cong. & Ad.News 237, 270–271.

6. *See, e. g.,* S.Rep.No.1097, 90th Cong., 2d Sess., [1968] U.S.Code Cong. & Ad.News 2112, 2113–2114; H.R.Rep.No.1577, 90th Cong., 2d Sess., [1968] U.S.Code Cong. & Ad.News 4412–4413.

7. *See, e. g.,* 114 Cong.Rec. 12310: "The files of law enforcement agencies throughout the country prove that 50 percent to 80 percent of America's guns are foreign imports. . . . If we seriously intend to curb crime in America, then we must certainly curb the import of surplus firearms, especially surplus handguns." (Statement of Senator Dodd).

8. Pursuant to the terms of the Mutual Security Act of 1954, the State Department was delegated responsibility to administer programs to control both the import to and the export from the United States of firearms.

9. *See, e. g.,* S.Rep.No.1097, 90th Cong., 2d Sess., *Individual Views of Messrs. Dirksen, Hruska, Thurmond, and Burdick on Title IV,* [1968] U.S.Code Cong. & Ad.News 2112, 2289, 2306.

Gun Control Act by the issuance of an Executive Order by which the import control functions previously assigned to the State Department were delegated to the Treasury Department. *See* Executive Order No. 11432, 33 Fed.Reg. 15701 (1968). Surely, if there were an overlap of the regulation of both imports and exports of firearms, the Executive Order's correction of only half the problem would be a curious solution.

■ As further evidence supporting his position, Mowad points to the firearms export license form prepared by the State Department. This form, although containing meticulously detailed instructions regarding the steps to be followed in lawfully exporting firearms, does not indicate to the applicant that he must also register as a licensed firearms dealer with the Treasury Department as a precondition to the exporting of firearms lawfully.[10] In view of all the factors advanced by Mowad indicating the correctness of his interpretation of the statutory language, and the Government's

failure to adduce any information to the contrary,[11] we conclude that Mowad's activities in this case do not constitute illegal dealing in firearms in violation of 18 U.S.C. § 922(a)(1), and that his conviction on that charge must be reversed.[12]

Next, we turn to Mowad's challenge to his conviction for attempting to export firearms illegally. In this challenge Mowad alleges that the evidence presented to the jury was basically equivocal in nature, and was thus insufficient to allow the jury to conclude that Mowad's conduct had amounted to an attempt to export firearms illegally. According to Mowad, the weapons he had purchased were intended for members of his family in Lebanon. A relative of Mowad, allegedly a member of the Lebanese legislature, was to secure the necessary approval of the Lebanese government so that the State Department would permit the export of the firearms. As matters developed, however, Mowad contends that he was arrested before he could follow through with his supposed plan, and he

---

**10.** Perhaps the most troubling aspect of the Government's position lies in the possibility that, if the Government's reasoning is applied literally, a bona fide exporter of firearms who, unlike Mowad, had secured the necessary export license, could be arrested and charged with a violation of 18 U.S.C. § 992(a)(1) as he was transporting to their point of shipment firearms destined for export. At trial, the exporter could not raise as a defense either his lack of knowledge of the necessity to register as a "licensed dealer" in order to export firearms lawfully, or his lack of intent to violate the law, for we have held that scienter need not be established to make out a violation under 18 U.S.C. § 922(a)(1). *See United States v. Ruisi,* 460 F.2d 153, 156 (2d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972).

**11.** We do not read the case cited by the Government, *Kaneshiro v. United States,* 445 F.2d 1266 (9th Cir.), *cert. denied,* 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 543 (1971), as apposite authority on the issue raised by Mowad on this appeal, *i. e.,* whether activities aimed solely at exporting firearms are within the scope of 18 U.S.C. § 922(a)(1). In *Kaneshiro,* unlike the present case, no challenge of any type to the sufficiency of the indictment was raised until the appeal. 445 U.S. at 1269. Further, the challenge to the indictment in that case merely alleged that, as worded, the charged violation failed to include all the required elements of the crime described by the relevant statute. *Id.*

Moreover, the appellants in that case appear to have assumed that the exporting of firearms alone, if carried on with sufficient regularity, could qualify one as a "dealer" within the meaning of the statute, the very assumption Mowad contests here.

We also regard as misplaced the Government's suggestion that, by adopting Mowad's position, we create a gap in the overall regulatory system controlling the flow of firearms to and from the United States. The firearm export control system operated by the State Department imposes record-keeping obligations on exporters of firearms, *see* 22 C.F.R. § 122.-05(a), the export license applications require adequate disclosure of pertinent information concerning proposed exports of firearms, and criminal sanctions are provided for non-compliance, *see, e. g.,* 22 C.F.R. § 127.03. In short, the State Department's export control system appears every bit as thorough and effective as the Treasury Department's import control system.

**12.** In view of our disposition of the "illegal dealing" charge on this ground, we need not and do not reach Mowad's additional contention that a person may not be found to be a "dealer" within the meaning of 18 U.S.C. § 922(a)(1) in the absence of evidence that he actually sold firearms to others.

contends that the arrest occurred in such a manner that, even assuming he intended to export the firearms without the required license, the Government could not prove how, when or where the illegal export would take place. Thus, Mowad argues that the Government failed to prove that his conduct constituted a "substantial step" toward the underlying substantive offense of exporting firearms illegally.

In this Circuit we have adopted a two tier test in reviewing convictions where criminal attempts were charged. The first tier inquiry relates to a determination as to whether sufficient proof exists to establish that the accused possessed the requisite criminal intent. Once intent has been established, the second tier inquiry concentrates on whether the accused's conduct may be viewed as sufficiently corroborative of his established criminal intent. *See United States v. Mandujano*, 499 F.2d 370, 376–77 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976).

We need not detain ourselves in the intent phase of our inquiry, as the conversations surreptitiously recorded by the AT&F agents at the Sportsman's Rendezvous contain repeated declarations by Mowad of his intentions to ship large quantities of firearms to Lebanon, as well as his recognition that his plans could not be accomplished within the law. Therefore, we have only to determine whether Mowad's conduct was sufficiently corroborative of his criminal intent.

We have recently indicated that "[w]hether conduct represents a substantial step towards the fulfillment of a criminal design is a determination so dependent on the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts." *United States v. Manley*, 632 F.2d 978, 988 (2d Cir. 1980). When the factual context of this case is examined, Mowad's conduct is not nearly as equivocal as he maintains it is. First, Mowad's characterization of the transaction as a typical legal purchase of firearms is inaccurate. To the contrary, Mowad had been informed that the firearms he was purchasing were stolen, and, as he had purchased firearms in conformance with the law on several previous occasions, Mowad knew that the required paperwork for the 110 handguns had not been completed. We further observe that legitimate purchases of firearms are not often consummated in abandoned warehouses under armed guard, as was the situation here.

In addition, several days prior to picking up the weapons, Mowad had a telephone conversation with Berger in which Mowad stated that the arranged pickup time would "leave us more than six, seven hours." [13] Testimony at trial by an AT&F agent, who had posed as a guard at the warehouse, established that after the weapons had been crated, Mowad had inquired of him as to the best route to New York City. The jury also was aware of the false exculpatory statements made by Mowad shortly after he was placed under arrest, *see* footnote 2, *supra.* In view of this evidence, we are convinced that the jury's conviction of Mowad on the attempted illegal export charge is consistent with the requirement that the conduct of the accused "has progressed sufficiently to minimize the risk of an unfair conviction," *United States v. Busic*, 549 F.2d 252, 257 n.9 (2d Cir. 1977).

Finally, Mowad contests his conviction on the conspiracy count. Mowad first contends that, because the jury was instructed that he could be convicted on the conspiracy charge if the evidence demonstrated that he had conspired with others to commit either of the other two charged violations of law, our reversal of his conviction on the illegal dealing charge requires that his conspiracy conviction be vacated as well. The law in this Circuit, however, is to the effect that a conspiracy conviction will be allowed to stand if proof exists of the defendant's intent to commit the offense

**13.** Mowad's remark prompted Berger to add: "That's all. Fly them the hell out of here.", to which Mowad responded: "Ya, that's what I'm saying."

which survives the review. *See United States v. Dixon*, 536 F.2d 1388, 1402 (2d Cir. 1976). Here, as we have indicated, proof of Mowad's intent to attempt to export firearms illegally was more than adequate.

Next, Mowad alleges that the proof that he acted in concert with others to accomplish his criminal design is insufficient to support his conspiracy conviction. However, an objective view of the evidence demonstrates otherwise. Two of Mowad's companions, Talal Doueihi and Sayid Kortobani, who were tried separately, entered guilty pleas to the attempted illegal export charge. Proof introduced at trial established that both Mowad and Kortobani had purchased handguns from the Sportsman's Rendezvous which they indicated were to be used as bribes to obtain clearance for future shipments of firearms through Lebanese customs. Both Mowad and Kortobani visited the Sportsman's Rendezvous on March 26, 1979, to firm up the details of the eventual handgun order, and both haggled with Ciulla over the price of the shipment. Finally, both Mowad and Kortobani paid portions of the total purchase price for the weapons to Ciulla and Berger. Given this evidence, the jury rationally could have found the existence of an unlawful agreement, at the very least one between Mowad and Kortobani, upon which to predicate Mowad's conspiracy conviction.

Finally, Mowad contends that a "conspiracy to attempt" the commission of a substantive offense cannot, as a matter of law, state a crime. Although this challenge to his conspiracy conviction has more merit perhaps than his challenges just discussed, we conclude that it too must fail. In support of his position, Mowad points to a case recently decided by the Fifth Circuit, *United States v. Meacham*, 626 F.2d 503 (5th Cir. 1980), which held that a "conspiracy to attempt" charge in an indictment failed to state an offense. In *Meacham*, however, the Government attempted to combine the conspiracy and attempt provisions contained in two identically worded sections of the Comprehensive Drug Abuse Prevention and Control Act of 1970 to synthesize the offense of "conspiracy to attempt." [14]

The situation in the present case, however, more closely resembles that involved in *United States v. Clay*, 495 F.2d 700 (7th Cir.), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974), in which a "conspiracy to attempt" charge was held to be sufficient to state an offense. In *Clay*, as here, the Government combined the general criminal conspiracy provision, 18 U.S.C. § 371, with a specific statutory provision describing an "offense against the United States." [15] Although it is probable that the "conspiracy to attempt" charge against Mowad was the result of careless indictment drafting and not innovative legal reasoning, the Government's charge contains all elements necessary to prosecute a conspiracy: a provision making the act of conspiring a crime and a provision making the object of the conspiracy a crime. Thus, because we believe that factors involved in

---

14. As the Fifth Circuit noted, the statutory provisions involved both stated: "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both . . . ." 21 U.S.C. § 846; 21 U.S.C. § 963. Thus, the Fifth Circuit correctly observed that the Government, by combining these two statutory provisions, had generated four discrete crimes (*i. e.*, conspiracy, attempt, conspiracy to attempt, attempt to conspire) from the three words "attempts or conspires." 626 F.2d at 508. The Fifth Circuit quite properly questioned the Government's assertion that Congress had contemplated and intended this result when it enacted the relevant statutory provisions.

15. In this case, 22 U.S.C. § 2778(c) makes it a crime to violate any rule or regulation issued under that section. In turn, 22 C.F.R. § 127.01, a regulation so promulgated, provides:

(a) It is unlawful to export or attempt to export from the United States any article or technical data for which a license or approval is required by this subchapter without first obtaining the required license or written approval from the Department of State. We agree with the Ninth Circuit that Congress may constitutionally authorize the Executive Branch to promulgate regulations in the arms control field which criminalize various acts involving the importation and exportation of arms. *United States v. Gurrola-Garcia*, 547 F.2d 1075 (9th Cir. 1976).

*Meacham* that are not present here provide a sufficient basis for distinguishing that case from the present case, we regard *Clay* as controlling and accordingly affirm Mowad's conspiracy conviction.

Mowad's remaining claim, involving his request for a new trial on the grounds that a potential juror's allegedly prejudicial remark "impermissibly infected" the jury panel, is so devoid of merit that discussion of this claim is unwarranted.

The judgment of the district court is affirmed in part and reversed in part, and the cause is remanded for action in the district court consistent with this opinion.