UNITED STATES of America, Appellee,

v.

John KATSOUGRAKIS, John Hiotis,
Defendants-Appellants.

Nos. 1029, 1030, Dockets 82–1392,
82–1400.

United States Court of Appeals,
Second Circuit.

Argued March 14, 1983.

Decided Aug. 12, 1983.

Certiorari Denied Jan. 9, 1984.
See 104 S.Ct. 704.

Gerald L. Shargel, New York City, for appellant Katsougrakis.

Jeffrey A. Rabin, Brooklyn, N.Y. (Jacob R. Evseroff, Brooklyn, N.Y., of counsel), for appellant Hiotis.

Jane Simkin Smith, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

John Katsougrakis and John Hiotis appeal from judgments entered in the United States District Court for the Eastern District of New York, Mishler, *J.*, after a jury trial convicting them of (1) conspiracy to commit mail fraud and to maliciously destroy a business premises by means of an explosive, 18 U.S.C. § 371 (1976) (Count I); (2) aiding, abetting and procuring persons to maliciously damage and destroy a business premises by means of an explosive, 18 U.S.C. § 844(i) (1976) (Count II); (3) two counts of mail fraud, 18 U.S.C. §§ 1341–42 (1976) (Counts III & IV); and (4) aiding, abetting and inducing persons to commit a felony (mail fraud) by means of an explosive, 18 U.S.C. § 844(h) (1976) (Count V).

The convictions obtained under the Explosive Control Act, specifically Counts II and V of the indictment, are reversed in light of our decision in *United States v. Gelb,* 700 F.2d 875 (2d Cir.1983). The convictions on the remaining counts are affirmed.

## BACKGROUND

Katsougrakis and Hiotis were co-owners of the stock in Mousaka Trading Corporation (MTC). MTC owned and operated two New York restaurants, one located in Great Neck and the other in Westbury, both under the trade name "Kings Villa Diner." The Westbury diner operated at a profit whereas the Great Neck diner sustained serious losses during 1979–81.[1] In fact, tax records introduced at trial revealed that liens had been levied against the Great Neck Kings Villa by the State Tax Commission, the New York State Unemployment Insurance Division and the federal government to recover substantial unpaid tax liability. When appellants were unable to sell the Great Neck diner, they resorted to arson.

Steven Karagiannis, who worked as a cook at the Westbury Kings Villa for five or six months during 1981, testified at trial that Katsougrakis and Hiotis approached him in July 1981 and inquired whether he knew any individuals who would be willing to set fire to the Great Neck diner. Although Karagiannis was unable to help them and in fact refused to discuss the scheme further, appellants ultimately did locate two individuals—Kyriakos "Charlie" Chrisanthou and John Kynegos—who were willing and able to carry out the arson. After several meetings, the conspirators planned the arson for the early morning hours of October 4, 1981. Appellants agreed to pay Chrisanthou and Kynegos $3,000 each for their efforts, with $800 to be paid in advance.

On October 4, Chrisanthou and Kynegos arrived at the diner at approximately 3:00 a.m., entered through the back door using a key provided by appellants and spread uncontained gasoline throughout the diner. After igniting the gasoline, Chrisanthou and Kynegos were unable to escape the inferno. Although flames were doused shortly thereafter by Nassau County firemen, the damage had already been done—

---

1. Stephen Linker, the accountant for Kings Villa, and Jacob Moser, an accountant for the Nassau County Police Department, both testified that in their expert opinion Great Neck Kings Villa was not a profitable corporation due to the high ratio of its current liabilities (approximately $125,000) to its current liquid assets ($3,184).

both men died several days later in the Nassau County Hospital.

Subsequent investigations by the Nassau County Fire Marshal's office, the Nassau County Police Department and a private firm commissioned by the insurer of the Kings Villa Diner confirmed that the fire was intentionally set by use of uncontained gasoline. The police also obtained a statement from Chrisanthou's wife Rose Marie in which she related that (1) Chrisanthou told her two weeks before the fire that he had agreed to set fire to a diner and that he showed her the Kings Villa business card; (2) two days before the fire, October 2, 1981, she drove her husband and Kynegos to a coffee shop in Astoria where they met with appellant Katsougrakis; and (3) on October 3, 1981, less than one day before the arson, Chrisanthou stated to her that he had just returned from a diner on Old Country Road (where Kings Villa is located) and had received the $800 advance.

Katsougrakis and Hiotis were indicted and, after a jury trial, were convicted on each count in the indictment. Judge Mishler sentenced appellants to five year terms of imprisonment on Counts I and V, sentences to run concurrently. They were sentenced to a fifteen year prison term on Count II and to five year terms on both Counts III and IV, sentences also to run concurrently. Execution of sentence was suspended on Counts II, III and IV and appellants were placed on probation for a term of five years, with the probationary period scheduled to commence after appellants had served prison terms imposed on Counts I and V. This appeal followed.

## DISCUSSION

### I. Gelb *Issue*

Section 1102 of the Explosive Control Act, 18 U.S.C. § 844 (1976) (Act),[2] makes it unlawful to maliciously damage or destroy a commercial premises by means of an "ex-

plosive." "Explosive" is defined in the penal section of the Act to include:

[G]unpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other *explosive* or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j) (1976) (emphasis added). An explosive is further defined as:

(5) The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

18 U.S.C. § 232(5) (1976). Appellants claim that the substance used to set fire to the Kings Villa Diner—uncontained gasoline—is not an "explosive" within the meaning of the Act and cite as support for that proposition our recent decision in *United States v. Gelb,* 700 F.2d 875 (2d Cir.1983), which was decided after these convictions.

In *Gelb,* we decided that arson committed by use of uncontained gasoline is not punishable under the Explosive Control Act. We observed that the Act was intended to accomplish an important, albeit limited, purpose:

---

**2.** Although commonly referred to as the Explosive Control Act, the legislation at issue here is properly characterized as Title XI of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, Title XI, § 1102, 84 Stat. 952 (1970).

The legislative history of the Act speaks of the dangers posed by subversive groups in the society. The perceived threat lay not so much in ideology or political objective, but rather focused on the alarming trend during the late 1960s when "selective bombing" emerged as a frequent vehicle for extreme social and political protest.

700 F.2d at 878. Accordingly, we reversed the judgment of conviction on the explosives counts, holding that uncontained gasoline was not an "explosive" within the meaning of section 844(j) because the legislative history of the Act:

> strongly supports the view that the Act was envisaged as anti-bombing, *not anti-arson,* legislation. We find nothing in the language or legislative history of the Act to challenge this conclusion. Moreover, responsibility for the investigation and prosecution of crimes involving common law arson has traditionally been left to the states, and we are reminded that: "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).

*Id.* at 878–79.

■ The government seeks to distinguish *Gelb* on the ground that proof at trial showed that an explosion actually occurred during the Kings Villa blaze. The government misunderstands our holding in *Gelb;* the fact that an explosion occurred is not determinative under the Act. The important question is whether an "explosive," as defined by the Act, 18 U.S.C. § 844(j) (1976), has been used in the commission of the allegedly criminal act. The evidence is uncontroverted that the blaze at Kings Villa was caused by use of uncontained gasoline—a typical arson. Since there are no persuasive reasons for distinguishing this case from *Gelb,* the convictions obtained under the Explosive Control Act—Counts II and V in the indictment—are reversed.

■ Appellants urge that the conspiracy count must also fall in light of our decision in *Gelb.* We have consistently held, however, that if one criminal object of the conspiracy is proved by clear and convincing evidence, the conspiracy conviction will be upheld on appeal even if additional criminal objects of the conspiracy are reversed. *See, e.g., United States v. Mowad,* 641 F.2d 1067, 1073–74 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981); *United States v. Dixon,* 536 F.2d 1388, 1401–02 (2d Cir.1976). In this case, one object of the alleged conspiracy—mail fraud—was proved by clear and convincing evidence and accordingly we affirm the conspiracy conviction.

Appellants acknowledge the *Mowad/Dixon* precedent, but urge that since the "explosives" charge was the more serious crime, we should remand to the district court for reconsideration of their sentences. While in a different case remand might be appropriate, we will not do so here. The fact that uncontained gasoline is not an "explosive" for purposes of the Explosive Control Act does not detract from the serious nature of appellants' acts. The evidence remains clear and convincing that appellants conspired with Chrisanthou and Kynegos to burn the Great Neck Kings Villa with the intent to defraud their insurer. We see no justification for a remand for resentencing.

Because the conspiracy and mail fraud counts are based in part on evidence admitted by the district court and challenged on appeal, we proceed to consider appellants' remaining claims.

## II. *Evidentiary Rulings*

### A. *Chrisanthou's "Nodding of Head"*

On the day following the Kings Villa fire, Fitos Vasiliou visited his friend Charlie Chrisanthou at the Nassau County Medical Center. Although Chrisanthou was badly burned and wrapped virtually from head to toe in bandages, Vasiliou was permitted to converse briefly with his friend. As recounted by Vasiliou at trial, the following colloquy took place during their visit:

[Prosecutor]: What did he [Chrisanthou] say? What did you say to him and what did you do?

[Vasiliou]: I said to him, you think they [Katsougrakis and Hiotis] set you up?

The Court: Say it again. The jurors don't hear you. Say it slowly and louder.

The Witness: I asked him if they set him up and they burned him in the diner. So he said, no.

The Court: Did he say, no, or did he just shake his head?

The Witness: No, he didn't say, no. He go like this.

The Court: Indicating the negative. All right.

The Witness: Go like this. I asked him—I said to him, you got paid to burn this place up. He go like this.

The Court: He indicated by shaking his head up and down [indicating the affirmative].

J. App. at 172–73.

Vasiliou further testified that he proceeded to the Westbury Kings Villa where he accused Hiotis and Katsougrakis of complicity in the arson and threatened that he would take his story to the police unless the wives of the dead men were "compensated." According to Vasiliou, Hiotis initially denied any involvement in the scheme, but later agreed to pay $6,000 for Vasiliou's "silence."[3] Vasiliou was subpoenaed to testify before the grand jury, but he never appeared, choosing instead to seek refuge in Cyprus. He did return, however, several days before trial and related under oath the substance of his various conversations with Chrisanthou and appellant Hiotis.

The district court, over the objection of defense counsel, permitted Vasiliou to recount his October 5, 1981 conversation with Chrisanthou in the Nassau County Hospital, including the various "nods" made by the decedent in response to Vasiliou's inquiries. On appeal, Katsougrakis and Hiotis charge that their constitutional rights under the Confrontation Clause were abridged by the admission of this hearsay testimony and further that the "nods" constitute inadmissible hearsay not falling within one of the recognized exceptions to that rule.[4]

A troublesome evidentiary question is presented when the government seeks to introduce a hearsay statement which is against the declarant's penal interest and which also inculpates the accused. Ordinarily, a statement against penal interest has clear guarantees of trustworthiness because, human nature being what it is, a person is unlikely to implicate himself criminally unless he was in fact involved in the criminal undertaking. The veracity of the hearsay statement may be questioned, however, when the declarant also inculpates a third party. For example, if during custodial interrogation the declarant perceived an opportunity to curry favor with the government by implicating both himself and a third party, he may choose this course in the hope of gaining immunity or a reduced sentence. See United States v. Oliver, 626 F.2d 254, 261 (2d Cir.1980). Since the declarant may in that circumstance have less than honorable motives for volunteering his "statement," that portion of the hearsay which inculpates the accused must be scrutinized carefully. The importance of this issue has prompted much scholarly debate, see, e.g., Tague, Perils of the Rule-

---

**3.** After the initial meeting between Vasiliou and Hiotis, Vasiliou was interviewed by an arson investigator, Phillip Horbert, for the Federal Bureau of Alcohol, Tobacco and Firearms (ATF). At a subsequent meeting with Hiotis, Vasiliou brandished the business card of the ATF agent; this gesture apparently convinced appellants that Vasiliou's threats were serious.

**4.** The parties correctly concede that a "nod" is a statement for purposes of the hearsay rule and will be held to constitute hearsay if intro-

duced to prove the truth of the matter asserted (i.e., a positive or negative answer in response to a particular question). See United States v. Ross, 321 F.2d 61, 69 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963) (pointing of finger held to be a statement for purposes of hearsay rule). Here, the government unquestionably offered this testimony to prove the truth of the matter asserted, i.e., that appellants participated in the arson scheme.

*making Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception,* 69 Geo. L.J. 851 (1981); Westen, *The Future of Confrontation,* 77 Mich.L.Rev. 1185 (1979); Younger, *Confrontation and Hearsay: A Look Backward, A Peek Forward,* 1 Hofstra L.Rev. 32 (1973), and although divergent views have been expressed, the courts generally agree on the relevant legal standard. *See, e.g., Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *United States v. Oliver,* 626 F.2d at 260–63; *United States v. Garris,* 616 F.2d 626, 629–31 (2d Cir.), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980). The moving party must show by a preponderance of the evidence that the "dual inculpatory" statement falls within a recognized exception to the hearsay rule and that attending circumstances confirm its trustworthiness. *United States v. Oliver,* 626 F.2d at 262; *United States v. Garris,* 616 F.2d at 630. Introduction of the hearsay statement under these circumstances does not offend the Confrontation Clause because there is strong indicia of reliability.

In this case, the government relied on Rule 804(b)(3) of the Federal Rules of Evidence, the penal interest exception to the hearsay rule, to meet its threshold burden.[5] To satisfy this exception, the proponent must show "(1) that the declarant is 'unavailable' as a witness, (2) that the statement is sufficiently reliable to warrant an inference that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true,' and (3) that 'corroborating circumstances clearly indicate the trustworthiness of the statement.' " *United States v. Oliver,* 626 F.2d at 260 (quoting Fed.R.Evid. 804(b)(3));

see *United States v. Lieberman,* 637 F.2d 95, 103–04 (2d Cir.1980).

■ Chrisanthou was unavailable to testify since he had died prior to trial. The "nods" clearly tended to subject Chrisanthou to criminal liability—by affirmative nod he admitted complicity in the criminal undertaking. Moreover, circumstances surrounding the conversation confirmed the reliability of the hearsay declaration and Chrisanthou's belief in its truth. The declarant was approaching death and was talking privately with his friend when the challenged admission was made. He was not conversing with police or other government agents whose favor he might be expected to curry. *See, e.g., United States v. Lieberman,* 637 F.2d at 103; *United States v. Garris,* 616 F.2d at 631–32. Indeed, if his intent was to implicate appellants falsely, he could have responded in the affirmative when asked whether Katsougrakis and Hiotis "set him up." Finally, corroborating circumstances confirm the trustworthiness of the statement. The evidence at trial showed that the Great Neck Kings Villa was experiencing recurring financial problems and that appellants twice tried to sell the diner. Expert testimony proved that the fire was intentionally set and the jury was free to infer that Katsougrakis and Hiotis were the only persons with a strong motive to have the diner destroyed by fire. In fact, Karagiannis testified that appellants asked him several months before the fire whether he knew anyone who could "do the job." Finally, the testimony of Rose Marie Chrisanthou and the non-hearsay testimony of Vasiliou concerning his meeting with Hiotis and the $6,000 payment provide further corroboration. The hearsay "nods" fall safely within the penal interest exception to the hearsay rule.

---

5. Rule 804(b)(3) provides:

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to

render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

■ Appellants argue that even if the Chrisanthou "nods" satisfy Rule 804(b)(3), they do not survive constitutional scrutiny under the Confrontation Clause. Katsougrakis and Hiotis correctly point out that even though a hearsay statement may fall within a hearsay exception, the statement of an unavailable declarant will nonetheless be excluded under the Confrontation Clause unless the court is satisfied that "it bears adequate 'indicia of reliability.'" *See Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970)); *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). As a practical matter, however, a hearsay statement that satisfies the penal interest exception usually will survive Confrontation Clause scrutiny because the "trustworthiness" issue has already been decided in favor of admissibility. The Supreme Court has reaffirmed this view, holding that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539.

Chrisanthou's nods fall within a "firmly rooted hearsay exception" and the corroborating circumstances detailed previously fully confirm their trustworthiness. As noted earlier, the principal danger of hearsay statements that implicate both the declarant and the accused is that the declarant may have some ulterior motive for volunteering evidence against both parties— the declarant may confess hoping to gain immunity or a reduced sentence in return for his cooperation in convicting the accused. *See United States v. Garris,* 616 F.2d at 631; *United States v. Lang,* 589 F.2d 92, 97 (2d Cir.1978) (this Court intimates in dictum that a hearsay statement which satisfies the penal interest exception may have been inadmissible if the declarant knew he was volunteering this information

to a government informant); *see generally* 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(3)[03], at 804–94–96 (1976). Here, there is no persuasive showing that Chrisanthou had an ulterior motive when conversing with his friend Vasiliou. His nods were entirely consistent with the evidence presented at trial; no confrontation problems are shown here.

Appellants urge that notwithstanding the merits of their hearsay and confrontation claims, the district judge erred by engaging in factfinding concerning the credibility of Vasiliou *after* notice of appeal had been filed.[6] Relying on *United States v. Alvarez,* 584 F.2d 694 (5th Cir.1978), and *United States v. Bagley,* 537 F.2d 162 (5th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), Judge Mishler determined that given the serious confrontation dangers attendant to admission of a hearsay statement that directly inculpates the accused, the trial judge must be satisfied that the in-court declarant is credible *before* permitting the jury to hear the hearsay statement. The judge conceded that credibility findings should be made *prior* to the introduction of the hearsay statement, but noted that his failure to do so did not materially affect appellants' rights because in retrospect Vasiliou was a credible witness.

■ The district judge erred by engaging in factfinding after notice of appeal had been filed. It is well settled that the filing of a timely and effective notice of appeal from a final judgment divests the court of jurisdiction to amend or otherwise reconsider that judgment.[7] *See Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966, 972–73 (2d Cir. 1975), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); 9 J. Moore, B. Ward, J. Lucas, Moore's Federal Practice ¶ 203.11 (2d ed. 1983). However, the "jurisdictional" defect is harmless in this case

---

**6.** Notice of appeal was filed on November 18, 1982. Judge Mishler's Memorandum of Decision was entered on December 13, 1982.

**7.** The trial court is not, however, barred from correcting clerical errors under Fed.R.Crim.P. 36 or from acting to aid the appeal. 9 J. Moore, B. Ward, J. Lucas, Moore's Federal Practice ¶ 203.11 (2d ed. 1983).

because we hold that the trial judge need not evaluate the credibility of the in-court witness before allowing admission of the hearsay statement.

We do not adopt the position taken by the Fifth Circuit that the credibility of the in-court witness must be evaluated *before* the jury is permitted to hear testimony that inculpates both the out-of-court declarant and the accused. *See United States v. Alvarez,* 584 F.2d at 701; *United States v. Bagley,* 537 F.2d at 167. We hold that the district judge must only be satisfied that the statement falls within a firmly recognized exception to the hearsay rule and that attending circumstances confirm its trustworthiness. While the hearsay declarant is, and necessarily must be, unavailable to testify, the in-court witness takes the stand and is subject to cross-examination. The jury is able to observe firsthand the witness' demeanor and response to questions; it may assess without obstacle the credibility of the witness. Indeed, to require a preliminary assessment of the in-court witness' credibility would, in our judgment, be a usurpation of the jury function. *See United States v. Atkins,* 558 F.2d 133, 137 (3d Cir.), *cert. denied,* 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 289 (1977); Tague, *Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception,* 69 Geo.L.J. 851, 974 (1981); *see also Dutton v. Evans,* 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) ("From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard." (footnote omitted)); *United States v. Lieberman,* 637 F.2d 95, 104 n. 12 (2d Cir.1980). We do not read the language or legislative history of Rule 804(b)(3) to contemplate a wholesale intrusion into the jury's function.[8]

**B. *Statements of Rose Marie Chrisanthou***

Appellants next argue that the district court erred by allowing Chrisanthou's wife Rose Marie to testify with respect to certain statements made by her husband prior to the arson. Rose Marie testified in substance that:

(1) approximately two weeks prior to the fire Chrisanthou stated that he and John Kynegos were to be paid $3,000 each for "torching" a diner and then showed her a business card with the name Kings Villa Diner printed on it;

(2) Chrisanthou's request on October 2, 1981 that she drive him to Astoria to meet with John Kynegos and "somebody else," who she later identified as appellant Katsougrakis; and

(3) on October 3, 1981, the day before the fire, Chrisanthou informed her that he planned to meet Kynegos and another individual to discuss the criminal scheme and, upon returning, stated to her that he had come from a diner on "Old County Road" (where the Kings Villa was located) and had received $800 as a down payment for the arson.

Judge Mishler correctly ruled that these hearsay statements were admissible under either the penal interest exception to the hearsay rule, Fed.R.Evid. 804(b)(3), or because they were statements of a co-conspirator in furtherance of the conspiracy, Fed.R.Evid. 801(d)(2)(E).

Turning first to Rule 804(b)(3), we have observed that:

The Rule does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution. Rather, it simply

---

**8.** Since we hold that appellants' rights under the Confrontation Clause were not abridged, there is no need to consider the alternative ground advanced by the district judge for admission of the Chrisanthou "nods," *i.e.,* that appellants waived their right of confrontation by "participat[ing] in the criminal activities leading to Chrisanthou's death." J. App. at 45; *see United States v. Mastrangelo,* 693 F.2d 269, 272 (2d Cir.1982). We voice no opinion on this alternative ruling.

requires that the incriminating statement sufficiently *"tended"* to subject the declarant to criminal liability "so that a reasonable man in his position would not have made the statement unless he believed it to be true."

*United States v. Lang,* 589 F.2d 92, 97 (2d Cir.1978), *quoted in United States v. Lieberman,* 637 F.2d at 104. The disputed statements clearly " 'tended' to subject the declarant to criminal liability"—with each statement, Chrisanthou provided more evidence of his complicity in the arson scheme. Moreover, the "marital" communications were corroborated by expert testimony of fire and police investigators, by testimony concerning the financial condition of the diner, by Karagiannis' testimony and the non-hearsay portions of Vasiliou's testimony. Chrisanthou had no motive to lie to his wife and had reaffirmed his resolve to commit the arson on several occasions over a two week period. The district judge did not abuse his discretion in ruling that corroborating circumstances confirmed the trustworthiness of the hearsay declaration. *See United States v. Winley,* 638 F.2d 560, 562 (2d Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982); *United States v. Guillette,* 547 F.2d 743, 754 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977).

Chrisanthou's statements to his wife were also properly admitted under the co-conspirator exception, Fed.R.Evid. 801(d)(2)(E).[9] A co-conspirator's statements will be admitted against the accused if the government can show by a preponderance of the evidence "that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the statement was made in furtherance of the

conspiracy." *United States v. Lieberman,* 637 F.2d at 102 (citing *United States v. Lyles,* 593 F.2d 182, 194 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); and *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)).

The evidence presented at trial, including testimony from Karagiannis, Vasiliou and Rose Marie Chrisanthou, clearly established that Charlie Chrisanthou, Katsougrakis and Hiotis were members of the arson conspiracy and that the conspiracy was in existence at the time the challenged statements were made. Chrisanthou's representations furthered the conspiracy because, with his wife's assistance and knowledge—if not complete approval—he was able to carry out his criminal responsibilities with greater facility. The disputed statements were properly admitted by the district judge.

### C. *"Hit Man" Testimony*

▆▆▆▆ During cross-examination of Vasiliou, defense counsel asked the witness whether he had mentioned in a prior interview with a federal agent that Chrisanthou and Kynegos had a "reputation for being what is known as hit men." The government promptly objected and demanded an offer of proof. When none was forthcoming, the trial judge sustained the government's objection, while also ruling that Chrisanthou's credibility was not subject to collateral attack.

Although the trial judge erred in ruling that Chrisanthou's credibility could not be attacked at trial, *see* Fed.R.Evid. 806, the judge correctly excluded any reference to "hit men" after counsel was unable to show a good faith basis for that line of question-

---

**9.** Rule 801(d)(2)(E) provides:

(d) Statements which are not hearsay. A statement is not hearsay if—

. . . .

(2) Admission by party-opponent. The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a state-

ment by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) *a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.*

(emphasis added).

ing. Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts. Counsel failed to advance any grounds to corroborate the "hit man" inquiry other than to note that a private investigator hired by the defense suspected that Chrisanthou and Kynegos were "thugs." However, the defense could not produce a source or other information to verify its suspicions. The trial judge properly sustained the government's objection.

We have considered appellants' remaining claims and find them to be without substantial merit. The convictions on Counts II and V are reversed. The judgments of the district court are affirmed in all other respects.