UNITED STATES of America, Appellee,

v.

Nathan LANG, Defendant-Appellant.

No. 215, Docket 78–1205.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1978.

Decided Nov. 30, 1978.

---

Denise Cote, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Barry Bassis, Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Before WATERMAN and MULLIGAN, Circuit Judges, and WYATT, District Judge.[*]

MULLIGAN, Circuit Judge:

On December 6, 1977, the defendant in this case, Nathan Lang, also known as "Cool Breeze," made the mistake of visiting Rikers Island, a New York City penal institution and the situs of a former incarceration. His hegira was prompted not by nostalgia but in order to retrieve some personal effects. Oddly enough he submitted to a routine search by a Corrections Officer. At his request Cool Breeze opened a black pouch he was carrying which contained a quarter-inch stack of brand new five dollar bills which were in four groups and each of which had identical serial numbers. When asked about the bills, Lang admitted that they were "play money", a street term commonly employed to describe counterfeit bills. Cool Breeze, not surprisingly, was arrested, given *Miranda* warnings and was indicted on January 19, 1978. His trial lasted about two days. It took the jury about the same time to reach a verdict and then only after two *Allen* charges to the jury. Lang was convicted on June 7, 1978 in the Southern District of New York and the district judge who presided over the trial was the Honorable William C. Conner. The crime for which Lang was convicted was the possession of 30 counterfeit five dollar Federal Reserve notes in violation of 18 U.S.C. § 472.

The principal characters in the transaction at issue include his girl friend Donna Paola (spelled Payola in the transcript) also known as "Chicago." While there seems to be little doubt about the romantic relationship between Cool Breeze and Chicago, there is a serious question about their business relationship, a central issue on this appeal. Cool Breeze did not testify and Chicago, for reasons not made evident in the record, was an unavailable witness. The alleged supplier of the counterfeit bills was Ronson Carey, also known as "Raheem," who was also an unavailable witness for reasons we shall discuss in some detail. Finally, there was the inevitable undercover Secret Service Agent, Douglas James, to whom Raheem had sold counterfeit bills originating from the same plates as the bills found in the possession of Cool Breeze. There was no issue concerning the defendant's possession of the counterfeit bills and no constitutional infirmity suggested as to

---

[*] Inzer B. Wyatt, United States District Judge, Southern District of New York, sitting by designation.

his search, arrest and the seizure of the bills. While some issue was raised as to whether he was knowingly in possession of counterfeit bills, his admission that it was "play money" undermined any real question on this point. The principal issue in the view of the trial judge and the one which may well have bothered the jury in its prolonged deliberations, was whether the Government had succeeded in establishing beyond a reasonable doubt that Lang possessed the money with the intent to defraud.

The trial judge's comments, made during several conferences with counsel which appear in the transcript, leave little doubt that the major source of the Government's proof and in fact its only proof that Lang intended to pass the money on for a profit consisted of a taped telephone conversation between Carey and the undercover agent James, which took place on December 9, 1977, three days after Lang's arrest. The admissibility of the taped conversation, which the trial judge characterized as "critical" to the Government's case, presents the dispositive issue on this appeal. It was admitted with considerable misgiving by the district judge, who on two occasions suggested that if he had erred, the Court of Appeals would provide guidance. We have considered the matter in detail and conclude that the taped conversation was inadmissible hearsay, not within the exceptions to the rule proposed to be applicable and further that the error cannot be characterized as harmless. Therefore, we reverse the conviction. Cool Breeze is free on bail pending this appeal.

Considerably bowdlerized, the taped conversation in issue here contained statements by Carey that Cool Breeze had gone to Rikers Island "all dust up and high" (according to expert testimony street jargon meaning under the influence of an hallucinogenic drug); that he had the counterfeit bills with him at that time; that he had been "busted" (arrested); that Carey had never met Cool Breeze but had been "juggling" (dealing) with him through his girl friend (Paola) who was his "contact" (middle person). The Government argued, and

the trial court ultimately accepted into evidence, the tape recorded conversation. The conversation was held admissible as an exception to the hearsay rule, as either a statement against penal interest by an unavailable witness, Fed.R.Evid. 804(b)(3), or, alternatively as "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy", Fed.R.Evid. 801(d)(2)(E). Although their Runyonesque sobriquets are more colorful, we shall refer to the participants hereafter by their proper names.

## I RULE 804(b)(3)—STATEMENT AGAINST PENAL INTEREST

### a) *Unavailability as a Witness*

Before the hearsay exceptions under Rule 804 become applicable, subdivision (a) of the rule requires that the declarant whose statement is sought to be introduced be unavailable as a witness. Judge Conner properly found that Carey was unavailable as a witness under Rule 804(a)(1), which provides that a declarant is unavailable if he is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement. Carey appeared in court with his attorney pursuant to subpoena and on direct examination by the Government invoked the Fifth Amendment with respect to any questions concerning the sale in issue. In contesting the finding of unavailability, the appellant relies upon the last sentence of Rule 804(a) which provides that "a declarant is not unavailable as a witness if his exemption . . . is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying." There is no suggestion that the Government in any way prevented Carey from testifying. He was represented by his own counsel and his refusal to testify was in his self-interest. Rather, the appellant proceeds on the theory that the Government acted wrongfully in not granting Carey immunity. However, the law appears to be well settled that the power of the Executive

Branch to grant immunity to a witness is discretionary and no obligation exists on the part of the United States Attorney to seek such immunity. *United States v. Bautista,* 509 F.2d 675, 677 (9th Cir.), cert. denied sub nom. *Monsivais v. United States,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *United States v. Ramsey,* 503 F.2d 524, 532–33 (7th Cir. 1974), cert. denied, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Berrigan,* 482 F.2d 171, 190 (3d Cir. 1973); *Earl v. United States,* 124 U.S. App.D.C. 77, 80, 361 F.2d 531, 534 (1966) (Burger, J.), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *People v. Sapia,* 41 N.Y.2d 160, 166, 391 N.Y.S.2d 93, 359 N.E.2d 688 (1976), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

The appellant relies solely upon *United States v. Morrison,* 535 F.2d 223, 229 (3d Cir.), cert. denied sub nom. *Boscia v. United States,* 429 U.S. 824, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976), which we find totally distinguishable. There the witness, who ultimately claimed the Fifth Amendment privilege, had initially indicated her willingness to testify for the defendant. However, the Assistant United States Attorney on several occasions advised her that if she did testify she would be liable to prosecution for perjury. She was served with an invalid subpoena under which she appeared in his office. There, in the presence of three undercover agents whose testimony she would have undermined, she was again advised of the dangers inherent in her testifying at trial. Under these circumstances the court found not surprisingly that the Government was guilty of such prosecutorial misconduct that use immunity should have been requested. No such circumstances existed here.

■ The appellant argues, however, that since Carey had already pled guilty to the crime of selling drugs to James, the undercover agent, and the Government had shown no interest in prosecuting him for his transaction with Paola, its failure to grant

Carey use immunity gave the prosecution a tactical advantage in introducing Carey's telephone conversation without the necessity of producing Carey for cross-examination. However, these facts parallel those in *Earl v. United States, supra,* where Judge (now Chief Justice) Burger held that there was no obligation to request immunity where the Government had previously dismissed certain pending charges against a witness and accepted a plea of guilty to another criminal transaction. "What Appellant asks this court to do is to command the Executive Branch of government to exercise the statutory power of the Executive to grant immunity in order to secure relevant testimony. This power is not inherent in the Executive and surely is not inherent in the judiciary." 124 U.S.App.D.C. 80, 361 F.2d at 534.[1]

It is doubtful, in any event, that Carey's testimony would have been helpful to Lang. Carey was called at trial as a witness for the Government and then claimed immunity. Certain interstices in the knowledge of Carey as to Lang's ultimate purchase of the bills which are not indicated in the tape might well have established the Government's case. We note that this court has held that the government is not obligated to grant immunity to witnesses so that they may be made available to testify on behalf of the defendant. *United States v. Stofsky,* 527 F.2d 237, 249 (2d Cir. 1975), cert. denied, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). In any event, there are sound policy considerations to support the case law here. While Carey had pled guilty to the sale to James, there were indications that he had been dealing in counterfeit notes with Paola and Lang and possibly others. Had he been given use immunity in this case he could have testified on direct or cross-examination to other transactions which would have resulted in effect in an immunity bath. Since there was no prosecutorial misconduct

1. In a footnote the opinion suggested that a more difficult problem would be presented if the Government had secured testimony from one witness by granting immunity while declining to seek immunity from one who would testify for the defendant. 124 U.S.App.D.C. at 80 n. 1, 361 F.2d at 534 n. 1. Here, as in *Earl,* we have no such problem since the Government did not offer immunity to any witness.

and no discriminatory use of immunity to obtain an unfair advantage over the defendant, there is no reason to depart from the case law and the clear language of the rule.

### b) *Statement Against Penal Interest*

██ Appellant also argues that Carey's statements were not against his penal interest and thus not within Rule 804(b)(3). This subsection of the Rule defines a statement against interest insofar as here relevant as one which "at the time of its making . . . so far tended to subject [the declarant] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." That Carey's statement reveals his criminal conduct as a seller of counterfeit notes is not open to question. Appellant argues, however, that since Carey made the statement to a person to whom he had recently sold counterfeit bills and who he believed to be a confederate, he could not reasonably be aware that by making the statement he was subjecting himself to criminal liability. This position, in our view, is not tenable. The Rule does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution. Rather, it simply requires that the incriminating statement sufficiently *"tended"* to subject the declarant to criminal liability "so that a reasonable man in his position would not have made the statement unless he believed it to be true." This is how Rule 804(b)(3) has been consistently interpreted. Thus, in *United States v. Barrett*, 539 F.2d 244, 249–51 (1st Cir. 1976), the court found that the reliability of an inculpatory hearsay statement made to an acquaintance during a card game was not impugned because the declarant "might not so readily have perceived the disserving character of what was said nor have expected his words to be repeated to the police." Id. at 251. We also note *United States v. Bagley,* 537 F.2d 162, 165 (5th Cir. 1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), where the court held that an unavailable witness's statement to a cellmate that he knowingly possessed heroin was against his penal interest under Rule 804(b)(3).

We do not think that a reasonable man would falsely admit the commission of a serious crime to his cellmate, knowing that there was a chance, even if slight, that this admission could be used to convict him and subject him to such severe penalties. The fact that the statement was made to a friend and cellmate has no relevance to the determination whether the statement was against the declarant's penal interest.

537 F.2d at 165.

The Advisory Committee's Note to Rule 804 indicates that the determination of whether the statement is in fact against interest must be determined from the circumstances of each case. Thus, if Carey knew that James was a Government agent his statement implicating himself and Lang might well be motivated by a desire to curry favor with the authorities. As the Committee Note states, "[o]n the other hand, the same words spoken under different circumstances, e. g., to an acquaintance, would have no difficulty in qualifying." We conclude that there was no motive here for Carey to lie to James. Moreover, the fact that the money sold to James was identical to that found on Lang supports an inference that the statement was not fabricated. We see no error in the district court's determination therefore that it was a declaration against penal interest within Rule 804(b)(3).

### c) *The Personal Knowledge of the Witness*

██ Despite our holding that Carey was an unavailable witness and that his statement was against penal interest within Rule 804(b)(3), we nonetheless hold that the admission of the tape constituted error requiring a reversal of the conviction. Although that Rule does not expressly incorporate a requirement that the declarant have personal knowledge of the facts to which his statement relates, Fed.R.Evid. 602 states that "[a] witness may not testify to a matter unless evidence is introduced

sufficient to support a finding that he has personal knowledge of the matter." The Advisory Committee Note to Rule 803 specifically provides:

> In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge. It may appear from his statement or be inferable from circumstances. See Rule 602.

This requirement of firsthand knowledge has "always been inherent in the statement against interest exception . . . and is assured by Rule 602." 4 Weinstein's Evidence ¶ 804(b)(3)[02] (1977); accord, McCormick, Evidence §§ 10, 276 (1972); V Wigmore, Evidence § 1471(a) (Chadbourn rev. 1974). In a supplemental brief filed after the argument of this appeal at the request of the Court, the Government concedes that Rule 602 does apply to statements offered pursuant to Rule 804.

■ The appellant contends that Carey could not possibly have had firsthand knowledge of Lang's presence and arrest on Rikers Island while under the influence of drugs. This particular information could have been harmful to the defense since Lang argues that he would not have submitted to a search of the pouch if he had been aware that the five dollar bills were in fact counterfeit. That argument would be somewhat defused if the jury accepted Carey's statement that Lang was in such a state of drug-induced euphoria that he was unconcerned about the discovery of the specious bills. The argument cuts both ways, however, because Lang's admission at Rikers Island that the bills were "play money," relied upon by the Government, could also be dismissed by the jury as unreliable if they believed Carey's statement. It is clear, however, that this part of the conversation should have been redacted since Carey was not on Rikers Island at the time of Lang's arrest and therefore lacked firsthand knowledge of that event. Moreover, this portion of Carey's statement was not contrary to his penal interest and for that reason should have been excluded. *United States v. Marquez,* 462 F.2d 893, 895 (2d Cir. 1972).

More crucial to the Government's case and Lang's defense was Carey's statement that the counterfeit money found in Lang's possession was supplied by Carey. Again, Carey did not personally know that he supplied counterfeit bills to Lang when Carey's statement itself admits that he dealt with Lang through Paola. More significantly, since intent to defraud was an essential element of the crime, Carey could not have had firsthand knowledge that Lang was the ultimate purchaser through Paola's agency when in the same conversation he admitted that he had never met Lang. Normally, one would expect that a dealer in counterfeit would have personal knowledge of the identity of his customers, thus satisfying the knowledge requirement implicit in Rule 804.

The trial court judge, keenly aware of the problem, suggested that Carey knew of Lang's participation as a purchaser of counterfeit money either directly from Lang or from his girl friend Paola. But in the conversation at issue here Carey denied ever having met Lang. In view of his other inculpatory admissions there is no reason to doubt the reliability of this disclaimer. Thus, we are left to speculate about the source of his knowledge. Whatever the speculation, we rule out firsthand knowledge and find no compliance with Rule 602.

The Government has argued in its supplemental memo that the likely source of Carey's belief that he was dealing with Lang was Paola. The Government then argues that even if Rule 804 is inapplicable, this multiple hearsay is admissible under Rule 805.

### d) *Hearsay Within Hearsay*

■ Fed.R.Evid. 805 provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." The Government argues that Carey's conversation with agent James was admissible as a statement against penal interest under Rule 804(b)(3).

The Government contends that Carey's lack of firsthand knowledge is no longer a problem since his information was derived from Paola's statement to Carey that she was purchasing for Lang, and Paola's statement was itself admissible under Rule 801(d)(2)(E) as a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.[2] This bootstrapping argument finds support in the case of hospital or business records which are held admissible even where the entrant has no personal knowledge of the underlying event or transaction but bases his entry on information supplied by a third person and the statement of that person qualifies as a hearsay exception. See, e. g., *United States v. Maddox,* 444 F.2d 148, 150–51 (2d Cir. 1971); *Felice v. Long Island Railroad Co.,* 426 F.2d 192, 196–97 (2d Cir.), cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). See also McCormick, *supra,* at § 313 p. 731; 4 Weinstein's Evidence, *supra* at ¶ 805[01]. While somewhat ingenious, this argument must fail here. Unlike the cases cited, there is no proof at all that Carey's statement that he was dealing with Lang was based on a statement by Paola. As we have suggested, such a conclusion could only be based on the supposition that since Paola was Lang's girl friend she was also his partner in crime. We have no evidence at all that the statement was made or, if it was made, under what circumstances or at what time. It is just as reasonable to suppose that if it was made by Paola, she was trying to minimize her role and to cast Lang in the role of principal culprit. There was evidence that Paola had attempted on her own to pass bills which were identical to those found in Lang's possession at Rikers Island. In sum, there is, on analysis, nothing here but sheer speculation with no indicia of reliability. We conclude that the Government's attempted proof of Lang's intent to defraud amounts to inadmissible hearsay and that in this case the requirement of Rule 602 is not saved by recourse to Rule 805.

## II  RULE 801(d)(2)(E)—STATEMENT BY A COCONSPIRATOR

The district court alternatively accepted the taped conversation into evidence on the grounds that it was "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E). Under this theory Carey was the coconspirator of Lang and his statement was made in the course of and in furtherance of the conspiracy. The appellant argues that there was insufficient independent non-hearsay evidence of the conspiracy, *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), cert. denied sub nom. *Lynch v. United States,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and that in any event the conspiracy had terminated with Lang's arrest prior to the conversation. While these arguments have some appeal we need not reach them since we cannot, in any event, reasonably find that Carey's conversation with James was "in furtherance of the conspiracy." The "in furtherance" requirement is mandated by the case law, *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970);

---

2. It might well be argued that Rule 805 literally does not apply here at all since a statement by a coconspirator of a party during the course and in furtherance of the conspiracy is classified by Rule 801(d) as a statement which is not hearsay. The statement is admissible not as an exception to the hearsay rule but rather as an admission by an agent of the party against whom it is to be used. Whether admissions are properly an exception to the hearsay rule is a subject which has long intrigued scholars in the field. See Morgan, Admissions as an Exception to the Hearsay Rule, 30 Yale L.J. 355 (1921); McCormick, *supra,* at § 262; 4 Weinstein's Evidence, *supra,* at ¶ 801(d)(2)[01]; IV Wigmore, *supra,* at § 1048. The admission by an absent agent would seem logically to constitute hearsay. Wigmore's argument that anything said by the party opponent may be used against him as an admission and satisfies the rule against hearsay since he is the only one to invoke that rule and he does not need to cross-examine himself, has no relevance when the statement is offered against him by an absent alleged agent. However, whatever logic supports Rule 805 would seemingly apply to the vicarious admission sought to be introduced here. Admissions rightly or wrongly are usually (although not in the Federal Rules of Evidence) regarded as an exception to the hearsay rule. McCormick, *supra,* at § 262.

*Wong Sun v. United States,* 371 U.S. 471, 490, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and has been specifically retained as a requirement in Rule 801(d)(2)(E). "The adoption of Rule 801(d)(2)(E) and the rejection of the Model Code—Uniform Rule approach [which scrapped the requirement] should be viewed as mandating a construction of the 'in furtherance' requirement protective of defendants, particularly since the Advisory Committee was concerned lest relaxation of this standard lead to the admission of less reliable evidence." 4 Weinstein's Evidence, *supra,* at ¶ 801(d)(2)(E)[01] p. 801–147.

■ The taped conversation simply revealed that Carey knew that Lang had been arrested with counterfeit money supplied by Carey and that James warned Carey to be careful in his future dealings with Lang. The Government's theory that this in some way advanced the interests of the alleged conspiracy between Lang and Carey rests upon the argument that it was in Lang's interest to have Carey continue in business. It is suggested that Carey's explanation that Lang was "busted" while under the influence of drugs would somehow blunt any future negative reaction by James to the purchase of more counterfeit. The argument is totally unpersuasive. We think that the district court's initial but not ultimate reaction was sound: "I don't know whether it was in furtherance of the objectives of the conspiracy. I don't know whether it was to further the conspiracy for him to say that one of his previous customers had been arrested with such bills, that might be counterproductive." We agree and find that the conversation cannot sensibly be viewed to advance the interests of any conspiracy between Carey and Lang. Lang was a purchaser who was at least temporarily out of business and Carey's conversation with James did nothing to advance any venture in which Lang was concerned. In fact, it would, if anything, discourage any future dealings between the two. There is no evidence that Lang had any interest whatsoever in any other business Carey might have. The conversation indicated that Lang was a bad risk and this advanced no interest of the appellant, or his alleged coconspirator.

■ We agree with the trial court, after reviewing the transcript in detail, that the taped telephone conversation was crucial to establish Lang's intent to defraud. Without it there was nothing of any substance to establish that Lang was a purchaser in business to make a profit by passing on spurious bills to an unsuspecting public, or, more likely, to an unsuspected undercover agent. The admission of the tape was, for the reasons given, reversible error.

Reversed and remanded. After remand, since there will or may be a second trial, we should say that we find no error in the other rulings of the trial judge here challenged: the admission of a statement by Lang that he had been unemployed (except for odd jobs) since 1970 and the "missing witness" jury instruction.