**UNITED STATES of America,**

v.

**BADALAMENTI, et al., Defendants.**

**No. SS 84 Cr. 236(PNL).**

United States District Court,
S.D. New York.

Jan. 7, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Richard Martin, Louis Freeh, Robert Stewart, Robert Bucknam, Asst. U.S. Attys., New York City, for U.S.

Michael Kennedy, New York City, for defendant Gaetano Badalamenti.

Ivan Fisher, New York City, for defendant Salvatore Catalano.

Anthony Lombardino, Kew Gardens, N.Y., for defendant Joseph Lamberti.

Joseph Benfante, New York City, for defendant Salvatore Mazzurco.

Frank A. Lopez, Brooklyn, N.Y., for defendant Salvatore Lamberti.

Steven Kimelman, New York City, for defendant Giovanni Ligammari.

James La Rossa & Paul Bergman, New York City, for defendant Baldassare Amato.

Lawrence H. Schoenbach, New York City, for defendant Vincenzo Randazzo.

Patrick Burke, Suffern, N.Y., for defendant Pietro Alfano.

David De Petris, New York City, for defendant Emmanuele Palazzolo.

David Lewis, New York City, for defendant Samuel Evola.

Robert Koppelman, New York City, for defendant Vito Badalamenti.

Larry Ruggiero, New York City, for defendant Giuseppe Trupiano and defendant Giuseppe Vitale.

James Moriarty, New York City, for defendant Lorenzo DeVardo.

Gerald V. Dichiara, New York City, for defendant Giovanni Cangialosi.

Robert C. Fogelnest, Philadelphia, Pa., for defendant Salvatore Salamone.

Larry Bronson, Bayonne, N.J., for defendant Salvatore Greco.

Kenneth Kaplan, New York City, for defendant Frank Castronovo.

Marvin Segal, New York City, for defendant Gaetano Mazzara.

Michael Querques, Orange, N.J., for defendant Francesco Polizzi.

Joseph W. Ryan, Jr., Mineola, N.Y., for defendant Filippo Casamento.

## OPINION AND ORDER: CONTORNO TESTIMONY

LEVAL, District Judge.

The Government offers as part of the testimony of Salvatore Contorno statements made to Contorno by six declarants. The Government contends that each of these six was a member of the conspiracy and that their statements are relevant to the charges. As against the defendants' hearsay objections, the Government contends the statements come within recognized exceptions, being either statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy," Fed.R.Evid. 801(d)(2)(E), or as statements of an unavailable declarant that "so far tended to subject him to ... criminal liability ... that a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true." Fed.R.Evid. 804(b)(3).

I directed that an offer of proof be made on the live testimony of Contorno. Contorno's testimony on these declarations was heard.

The declarations at issue are those of Emanuele D'Agostino and Leonardo Greco primarily concerning a meeting at a farmhouse in Sicily at which a shipment of drugs was tested for purity; and statements of Carlo Castronovo, Nunzio LaMattina, Antonino Rotolo and Mimmo Teresi, offering to admit Contorno as a partner in drug deals and describing aspects of their dealings.

Numerous arguments are advanced by defendants against the admission of these statements, including, as to the co-conspirator basis under 801(d)(2)(E), that the declarants' membership in the conspiracy with the defendants is not shown by independent evidence, see *United States v. Cambindo Valencia*, 609 F.2d 603, 631 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), that the statements were not in furtherance of the conspiracy, either because they were merely narrative, see *United States v. Lieberman*, 637 F.2d 95, 102–03 (2d Cir.1980), or because Contorno was importuning the declarants with pleas for charity and the declarants were not in any realistic sense seeking to advance their conspiracy by including him in it; as to the against penal interest basis, that the declarants are not sufficiently shown to be unavailable as witnesses, that the statements were not within the knowledge of the declarants, see *United States v. Lang*, 589 F.2d 92 (2d Cir. 1978), and the statements were not against the declarants' penal interest because the circumstances gave the declarants no reason to fear prosecution. Defendants argue further that the receipt of these statements violates the Confrontation Clause of the Constitution by subjecting them to incriminating assertions made by persons not subject to cross-examination. See *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Wright*, 588 F.2d 31 (2d Cir.1978), *cert. denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Puco*, 476 F.2d 1099 (2d Cir.), *cert. denied*, 414 U.S. 844, 94 SCt. 106, 38 L.Ed.2d 82 (1973).

■ I have given careful consideration to each of the proffered statements in the context of the numerous arguments made and find that the major part of the declarations are admissible, but that certain portions are not.

### D'Agostino and Leonardo Greco

According to Contorno's testimony, D'Agostino offered Contorno the opportunity to participate as an investor in D'Agostino's heroin transactions. (The two had in earlier years invested together in cigarette smuggling.) D'Agostino told Contorno he needed 50 million lire to invest in one-half kilo of heroin, that the investment was safe because the drugs were handled by Mafia men and that D'Agostino had a friend, Tanino Mazzara, a Mafia member of the Noce family who handled the transactions in the United States. (The Government alleges this referred to the defendant Gaetano Mazzara.) This matter is admissible whether as a co-conspirator's statements in

furtherance of the conspiracy or as an admission against penal interest.

D'Agostino's membership in a conspiracy with the defendants is shown by independent proof, including D'Agostino's meeting at the farmhouse with Ganci, Catalano, Mazzara, Castronovo and Salvatore Greco. An invitation of participation as an investor is in furtherance of the purposes of the conspiracy even if Contorno· was more eager to join than D'Agostino was to have him.

As to the against penal interest exception, D'Agostino's acknowledgement of his role in drug dealing unquestionably qualifies. See *Lieberman, supra,* 637 F.2d at 103–04. So also does the further extension of the statement in which D'Agostino tells that he sends the drugs to his friend Mazzara, which is equally against D'Agostino's penal interest; it is within his personal knowledge; the circumstances strongly suggest that D'Agostino would not have said it unless it were true. The Court of Appeals made clear in *Lieberman, supra,* 637 F.2d at 103, *United States v. Garris,* 616 F.2d 626, 631–32 (2d Cir.), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980); *United States v. Katsougrakis,* 715 F.2d 769, 775 (2d Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); and *United States v. Stratton,* 779 F.2d 820 (2d Cir.1985), that an extension of a declaration against penal interest that shows the guilt of another person (generally a defendant), made on personal knowledge, is admissible as part of the statement if it possesses the degree of reliability ("a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true") that the rule requires, and if its trustworthiness is corroborated by the circumstances. Courts and commentators have recognized the danger that in confessions to law enforcement officers, assertions of the guilt of other persons should be assessed with caution by reason of the declarant's possible motive to fabricate or exaggerate the implication of another for his personal interest. See *Lieberman,* 637 F.2d at 103; *Garris,* 616 F.2d at 631–32; *Lang,* 589 F.2d at 97; Advisory Committee Notes to Rule 804(b)(3). That concern has no role here. See *Katsougrakis,* 715 F.2d at 775 (statement to a friend of declarant sufficiently reliable).

As to the Bagheria farmhouse transaction, the evidence shows that D'Agostino was employing Contorno in furtherance of the transaction. D'Agostino had employed Contorno as a helper on previous occasions. D'Agostino solicited Contorno to drive him to the farmhouse and explained they were going to test a shipment of drugs. D'Agostino knew Contorno was armed, as was his habit. .(Contorno testified to the importance of being armed when in the presence of substantial quantities of drugs, since anything can happen.) D'Agostino's statements to Contorno along the way that they were going to test a shipment of drugs[1] and who would be there, is admissible as in furtherance of the conspiracy. D'Agostino was receiving support through the armed presence of Contorno. It was important for Contorno to be aware who was expected and what would happen.

Furthermore, on the way, D'Agostino offered Contorno the opportunity to participate in the venture financially if he could raise the capital. According to Contorno's understanding of D'Agostino's remarks in this connection, Contorno could have been cut into this deal at any time up to the loss of the drugs in Milan. D'Agostino's explanation of details, including the participants, is in furtherance of an offer of participation to a potential investor. See *United States v. Perez,* 702 F.2d 33, 37 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983); *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978).

---

**1.** The rule of *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed.2d 706 (1892), reflected in Fed.R.Evid. 803(3) would also justify the receipt of this statement of intention. See *United States v. Cicale,* 691 F.2d 95, 104 (2d Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983).

The co-conspirator-in-furtherance exception also justifies receipt of the few statements of Leonardo Greco who told D'Agostino that he would send someone to show them where the drugs would be tested and that he had sent his brother to be present at the testing.

The same exceptions justify receipt of D'Agostino's remark on leaving the farmhouse that the drugs had tested well and that the packages had been marked to protect against substitution.

Around two weeks later, D'Agostino told Contorno that the shipment had been lost to the police in Milan. He told Contorno there had been 40 kilos. Admission of ownership of a drug shipment that has been seized by the police has a high capacity to expose the declarant to criminal liability. The statement is within the *against penal interest* exception. In addition, D'Agostino told Contorno of the loss as explanation of why Contorno would not receive a gratuity in connection with the deal, with the promise that there would be other opportunities. This aspect of the statement—the advice of the loss as explanation for failure to pay a gratuity to one who helped in the transaction—may also be justified on in-furtherance grounds.

D'Agostino had other conversations with Contorno between the testing day and the seizure. For instance, he had said that Leonardo Greco had sent the shipment to Milan in a fruit truck. Such conversations seem more like narrative gossip than attempts to further the conspiracy and are therefore inadmissible under Rule 801(d)(2)(E). As to the Rule 804(b)(3) exception, although the statements have some capacity to incriminate the declarant, they assert facts outside his personal knowledge. See *Lang, supra;* Fed.R.Evid. 602. They are excluded.

### Carlo Castronovo

Contorno's testimony concerning the statements of Carlo Castronovo are admissible under the *against penal interest* exception, in combination with the *co-conspirator-in-furtherance* exception. Carlo Castronovo, who had done cigarette smuggling as well as cattle dealing with Contorno in earlier years, advised Contorno in 1978–79 that he was dealing in drugs with a La Cosa Nostra cousin in America—Ciccio Castronovo—(asserted by the Government to be the defendant Frank Castronovo) who used pizza restaurants as a front. He invited Contorno to participate.

His admission of drug dealings and also his identification of his cousin as his partner are properly received as statements against his penal interest. See *Stratton, supra,* at 828–30; *Katsougrakis, supra,* 715 F.2d at 775; *Lieberman, supra,* 637 F.2d at 103; *Garris, supra,* 616 F.2d at 630. Like D'Agostino's statement to Contorno about Mazzara, Carlo Castronovo's statement that he dealt with his cousin Ciccio in the United States was within his personal knowledge, was an integral part of a statement clearly against his penal interest, was trustworthy and satisfied all the requirements of Rule 804(b)(3).

As to Carlo's statement that his cousin used pizza parlors as a front for drugs, however, another problem arises; no showing is made that this was within Carlo's knowledge. That bars receipt under the *against penal interest* exception. See *Lang, supra.*

This portion of the statement may nonetheless be received if made by a co-conspirator in furtherance of the conspiracy. Personal knowledge of the declarant is not required where the basis of admissibility is the defendant co-conspirator's authorization (under agency theory) to make the statements—especially where, as here, the statement is within the knowledge of the "authorizing" defendants. See *United States v. McLernon,* 746 F.2d 1098, 1106 (6th Cir.1984) (personal knowledge requirement not applicable to Rule 801(d)(2)(E)); *United States v. Ammar,* 714 F.2d 238, 254 (3d Cir.) (personal knowledge requirement applies to Rules 803 and 804, but not to Rule 801(d)(2)(E)), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); Advisory Committee Note to Rule 801; McCormick, *Handbook of the Law of Evidence,* § 262 at 628 & § 263 at 632 (2d ed.

1972). The statement is unquestionably made in furtherance of narcotics transactions as it is part of Carlo's invitation to Contorno to invest. The conspiracy between the declarant Carlo and the defendants must be shown by evidence independent of the hearsay being offered. *Cambindo Valencia, supra,* 609 F.2d at 631, 635.

As proof independent of Carlo's statement that Ciccio operates through pizza parlors, the Government offers a variety of evidence. First, there is the other part of Carlo's statement, received as against Carlo's penal interest, that Carlo's New York importer is his cousin Ciccio, shown to be the defendant Frank Castronovo. Second, shortly after the police seizure of the 40 kilograms in Milan, defendant Frank Castronovo is shown to have telephoned to Carlo in Sicily. Carlo was a Mafia member of the Bagheria family. Leonardo Greco, capo of the Bagheria family, was shown by D'Agostino's statements to be the principal Sicilian owner of the Bagheria shipment. Leonardo Greco sent his brother Salvatore to the farmhouse testing meeting. Frank Castronovo also attended the testing meeting. Frank had been observed on February 14 in Palermo with a person connected by surveillance with Ragusa, who in turn was seen with colleagues of Frank Castronovo in Palermo, and a month later, on the eve of the seizure was observed with the Adamitas in Milan. The Adamitas were arrested immediately after consigning the 40 kilograms of heroin to a New York address apparently controlled by Ragusa. Furthermore, there is evidence of meetings between Mazzara and Carlo Castronovo in Sicily in 1983, apparently concerning Mazzara's efforts to resolve payment problems that had arisen between the Sicilian exporters and New York importers.

This evidence amply satisfies the *United States v. Geaney,* 417 F.2d 1116 (2d Cir.

1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), requirement of showing the conspiratorial association between Carlo Castronovo and the New York defendant group.

Defendants argue that most of this evidence postdates the statement. They contend that the only evidence of an association existing at the time of the statement about Ciccio's use of pizza restaurants as fronts is the other part of the same statement to the effect that Carlo's cousin Ciccio was his New York contact. Defendants argue that the *Cambinda Valencia* requirement of *independent* proof forbids use of any part of the statement to determine whether the connection has been shown.

This misunderstands and distorts the proposition. *Cambindo Valencia* forbids bootstrapping by using the content of the hearsay to demonstrate the satisfaction of the conditions of its admissibility. The requirement that the conspiratorial association be made out by *independent* proof may be satisfied by any admissible proof. It makes no difference whether this independent proof is an independently admissible part of the declarant's same statement, so long as the portion relied on has an independent basis of admissibility. *United States v. Cambindo Valencia, supra,* 609 F.2d at 635 n. 24; see *United States v. Cicale,* 691 F.2d 95, 103–05 (2d Cir.1982) (statements of co-conspirator declarant independently admissible under a separate hearsay exception (Rule 803(3)) and thus may be relied on to make *Geaney* finding), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983); *United States v. Sperling,* 726 F.2d 69 (2d Cir.) (similar to *Cicale* ), *cert. denied,* —— U.S. ——, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984). No bootstrapping is involved since the statement relied on to support the hearsay is independently received.[2]

---

**2.** As the *Cambindo Valencia* court noted in a footnote, when *Geaney* refers to independent nonhearsay evidence of the defendant's participation in the conspiracy, "it is necessarily singling out more specifically evidence that would otherwise be inadmissible were it not for the coconspirator exception, Fed.R.Evid. 801(d)(2)(E). Otherwise, all of the hearsay deemed admissible pursuant to the hearsay exception rules of Fed.R.Evid. 803 and 804 would be ineligible for proof *aliunde* of a defendant's or a *declarant's* participation in a conspiracy,

Here, as explained above, Carlo's statement that he dealt with his cousin Ciccio in the United States was admissible under Rule 804(b)(3). It is therefore independent proof that may be considered in deciding whether the association between Carlo and the defendant Frank Castronovo has been shown as a basis for admitting Carlo's further statement that Ciccio used pizza restaurants as fronts. That association is adequately shown.

In conclusion, Carlo's statement that he dealt in drugs through his cousin Ciccio in the United States is admissible as against Carlo's penal interest under 804(b)(3). The further statement that Ciccio used pizza restaurants as fronts is admissible as a co-conspirator's statement in furtherance of the conspiracy under 801(d)(2)(E).

### Mimmo Teresi

As to Mimmo Teresi, Contorno testified that Teresi told him that Teresi, together with certain named partners (not defendants), was dealing in drugs through a phony powdered milk company on Via Longa in Milan. He named defendants Ganci and Catalano as the United States receivers of the drugs. He offered Contorno the opportunity to invest in drugs through his milk company if Contorno could raise the capital.

Teresi's admission of his drug dealings through the Milanese milk company is properly received as *against penal interest*, including also his identification of his

partners. Other evidence links the milk company to the defendants' conspiracy through monies smuggled into Switzerland to pay for drugs.

The most prejudicial part of the Teresi statements is his naming of defendants Ganci and Catalano as the United States receivers. This is not shown to be within Teresi's personal knowledge, making it inadmissible under the *against penal interest* exception, see *Lang, supra;* the demonstration that this was said in furtherance of the conspiracy is also quite weak. Furthermore, upon later questioning by the court, Contorno denied that Teresi had named the United States receivers. When I pointed out these problems at an unrecorded bench conference, the Government withdrew its offer of the Ganci-Catalano statement.

### Rotolo and LaMattina

Contorno testified at the hearing that in 1977–78 both LaMattina and Rotolo offered him the opportunity to invest in their drug importations. Contorno had earlier invested with them in cigarette smuggling which had involved use of ships bringing tobacco from the Near East. Traffic in tobacco had ceased. Contorno was told that the heroin importation involved the same routes and facilities of shipping as the cigarette traffic. He was told prices and other details including that the heroin was shipped to Mafia members in the United States.

---

surely a result not intended by the rules or the court in *Geaney.*" 609 F.2d at 635 n. 24 (emphasis added).

By letter to the court dated December 27, 1985 submitted after release of my opinion in draft, counsel for defendant Amato argues that the opinion of the Court of Appeals in *Cambindo Valencia, supra,* 609 F.2d at 635 n. 24, did not intend to allow use of any part of the statement to prove its admissibility as a co-conspirator's statement, even though a different basis of admission supports the part relied on.

I continue to disagree with this argument and believe its fallacy is demonstrated by the following example.

If the co-conspirator's statement was in part uttered in the presence of the defendant, in part not, the part uttered in the presence of the defendant is admissible as an adoptive admission of the defendant. If that part demonstrates

the existence of a conspiracy between the declarant and the defendants on trial sufficiently to satisfy *Geaney,* the remainder of the statement will also be admissible if in furtherance of the conspiracy. There is no offense to the principles of *Cambindo Valencia* notwithstanding that part of the same statement is used to demonstrate the admissibility of the remainder because the part so used is independently admissible. Thus, the "bootstrapping" found problematic in *Cambinda Valencia* is not involved.

Here, likewise, the part of Carlo Castronovo's statement relied on to show his conspiracy with Frank Castronovo is independently admissible. No circularity or bootstrapping is involved.

Finally, I note that even without considering Carlo Castronovo's *against penal interest* statements, there is probably sufficient nonhearsay evidence tying him to the conspiracy with defendant Frank Castronovo.

These declarations are properly received as co-conspirators' statements in furtherance of the conspiracy if independent evidence shows LaMattina's and Rotolo's involvement with the defendants. In my opinion this is sufficiently demonstrated. Evidence obtained in the Swiss depositions shows that LaMattina had incurred a huge debt to suppliers of morphine base from Turkey which caused interruption of the traffic, that Rotolo, accompanied by LaMattina's son-in-law, Priolo, arranged to make payments retiring part of LaMattina's debt and reopening the traffic, that dollars collected by couriers in New York from Ganci and Castronovo, among others, were routed through Swiss accounts to pay for the morphine base.

Defendants argue that Rotolo's and LaMattina's statements were made, according to Contorno's testimony, considerably earlier than the first observations of defendants in conspiratorial relationships; that LaMattina is not shown to have received money from the defendants in New York; and that LaMattina and Rotolo were not seeking to further their business by including Contorno but were merely responding to his repeated pleas for charity.

These are reasonable arguments, but not in the end persuasive. The Government's evidence shows five New York defendants (Ganci, Catalano, Mazzara, Frank Castronovo and Salvatore Greco) testing a huge multimillion dollar shipment of narcotics in a Sicilian farmhouse in February or March 1980. There is evidence that prior shipments had resulted in problems of quality. Police surveillance evidence in Sicily in February 1980 shows prior organizational travel to Rome and Sicily by several of the New York defendants. Evidence from the U.S. wiretaps and surveillances shows years of subsequent continuation among the Bagheria farmhouse participants of their drug importing conspiracy. Also, the statements of D'Agostino about Mazzara and of Carlo Castronovo about his cousin Ciccio in the United States show those two defendants (who are close friends and restaurant partners) to have been involved in drug importation earlier than the Bagheria farmhouse incident. Contorno placed those statements in 1979.

The evidence strongly suggests that so elaborate, far-flung and long-lived a conspiracy, dealing in huge amounts of money and drugs through a complicated and elaborate international network, was not born fully formed at the moment its operation is first observed in February 1980. All the surrounding evidence strongly suggests that these elaborate international conspiratorial arrangements were operating long before Contorno sees them in operation in February or March of 1980. All that is needed to make the evidence admissible is satisfaction of the *Geaney* threshold test as to the existence of the conspiratorial relationships between the New York defendant group and LaMattina and Rotolo at the time of their making the statements. I find that this is sufficiently shown.

The evidence connecting LaMattina to the New York defendants' conspiracy also is sufficiently shown. The fact that Rotolo must arrange to satisfy LaMattina's debt to Musullulu before Musullulu will reopen dealings with Rotolo, coupled with the involvement of LaMattina's son-in-law and assistant, Priolo, in Rotolo's negotiations with Musullulu's representative to get the traffic-moving again, shows (sufficiently to satisfy the *Geaney* issue) that LaMattina and Rotolo were negotiating for the same account. The evidence of the Swiss money transfers shows, sufficiently to meet the *Geaney* test, that this was the account of the New York defendant group. The evidence is admissible.

Nor do I find merit in the argument that, because Contorno thereafter repeatedly importuned LaMattina and Rotolo for opportunities to earn money, all their statements should be excluded. It is argued that, after repeated discussions, LaMattina and Rotolo knew well that Contorno was broke and could not invest; their conversations with him were not really seeking to further any conspiracy, but were nothing more than a polite way of putting off persistent solicitation. This argument might have

some force if the Government were offering statements made by LaMattina and Rotolo in later conversations with Contorno. But it is my understanding of the Government's offer of proof and of Contorno's testimony that the offered statements were made by LaMattina and Rotolo in their early conversations with Contorno. Contorno, although in diminished circumstances, was a Mafia member and had been a co-venturer with them in tobacco smuggling. There is no reason to doubt that their early responses to his approaches by offering him participation genuinely contemplated furthering Mafia business by bringing in a trusted participant.

The evidence of LaMattina's and Rotolo's statements would also qualify for receipt as statements against their penal interests under Rule 804(b)(3). All the requirements are met.

The most damaging part of the LaMattina declaration was his statement, according to Contorno, that Ganci and Catalano were the United States receivers of the heroin. When questioned by the Government on the offer of proof, Contorno testified that although LaMattina had told him who were the U.S. receivers, he could not remember the names. Since Contorno made numerous references to the names Ganci, Catalano, Mazzara, Castronovo and Salvatore Greco, I then questioned him to determine whether his statement that he could not remember the names mentioned by LaMattina meant that they were names other than the familiar ones. He answered that he now remembers that it was Ganci and Catalano.

In view of the highly prejudicial nature of this evidence, its low reliability given Contorno's sudden turnabout on his ability to remember it, the absence of proof of LaMattina's personal knowledge of that fact and, of course, the pervasive problem for this kind of proof of the defendants' inability to cross-examine LaMattina, the supposed maker of the statement, I expressed concern as to whether this part of the LaMattina declaration should be received. The Government answered that it would not offer Contorno's testimony as to LaMattina's identification of Ganci and Catalano. That detail accordingly is excluded.

*Additional General Arguments*

■ I do not find merit in the defendants' other arguments. As to the unavailability of the declarants—a requirement of 804(b)(3)—the Government asserts that D'Agostino, LaMattina and Teresi are dead, while Rotolo, Leonardo Greco and Carlo Castronovo are prisoners and defendants in Italy. (Leonardo Greco is also a defendant in this action.) Defendants argue that the deaths have not been proved and that as to the prisoners, mechanisms are potentially available to the Government under the new mutual assistance treaty with Italy to secure their presence as witnesses. The Government has submitted an affidavit answering the defendant's claims as to unavailability. The affidavit shows, as to the dead declarants, that the information on their deaths was provided by Dr. Rocco Palamara, Director of the Office of Extradition for the Italian Ministry of Grace and Justice. As to the declarants who are prisoners in Italy, Dr. Palamara advised that they face trial in Italy which is scheduled for February 10, 1986 and that Italy would refuse to extradite them under the treaty, as is its right. This demonstration of their unavailability is sufficient to satisfy Rule 804(b)(3).

\* \* \*

■ I do not find merit in the defendants' further argument that the Mafia's code of silence eliminated any risk that the declarants would incur criminal liability in making the declarations. The question as to such declarations is whether under the circumstances the declarant would have been unlikely to say it had not been true. To be against penal interest under the rule, the statement need not be made to persons who are likely to use it against the declarant in court proceedings. Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. See, e.g., *Lieberman, supra,* 637 F.2d at 104; *Puco,*

*supra;* see also *Lang, supra,* 589 F.2d at 97–99 (where the disallowance was because the declaration included matter beyond declarant's testimonial capacity, not because it was spoken to one believed to be a trustworthy accomplice). Indeed, that makes such declarations more trustworthy. See *Stratton, supra,* at 828–29. The circumstances of the making of the declarations now being admitted support their reliability.

\* \* \*

█ Finally, there is no merit to the argument that admission of these out of court declarations by unavailable witnesses violates the Confrontation Clause of the Constitution. If it is the law in this Circuit that such declarations are not to be received or are subject to a higher standard of reliability if they are "crucial" to the Government's case and "devastating" to the defendant, see *Stratton, supra,* at 830; *Wright, supra,* 588 F.2d at 38–39; *Puco, supra,* 476 F.2d at 1103; see also *Dutton v. Evans, supra,* 400 U.S. at 87, 91 S.Ct. at 219 (dicta) (where Justice Stewart commented that the statements there received against a Confrontation Clause challenge were neither "crucial" nor "devastating"), it is sufficient to answer that these declarations are neither crucial nor devastating. See *United States v. Southland Corp.,* 760 F.2d 1366, 1377 (2d Cir.1985). They are merely reliable evidence, within accepted categories of exception to the hearsay rule, which tend to confirm aspects of otherwise extensive proofs. See *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Katsougrakis, supra,* 715 F.2d at 776.

SO ORDERED.